**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Chidinma Grace Salako,<br><br>Plaintiff,<br><br>v.<br><br>Rushmore Loan Management Services LLC, *et al.*,<br><br>Defendants. | No. CV-25-01063-PHX-JJT<br><br>**ORDER** |

At issue are five motions and a notice of noncompliance with discovery. The filings fall along two lines, either relating to discovery or summary judgment. The discovery filings include Defendant Nationstar Mortgage LLC and Defendant Rushmore Loan Management Services LLC's (collectively, Defendants) Notice of Noncompliance (Doc. 225), to which *pro se* Plaintiff Chidinma Grace Salako responds (Doc. 244), Defendants reply (Doc. 245), and Plaintiff improperly surreplies (Doc. 248). Plaintiff also files a Motion for Protective Order (Doc. 229), to which Defendants respond (Doc. 237), and Plaintiff replies (Doc. 247).

The central motion at issue, however, is Defendants' joint Motion for Summary Judgment (Doc. 218, MSJ), to which Plaintiff responds and files a Cross Motion for Partial Summary Judgment (Doc. 233, X-MSJ), and Defendants reply (Doc. 239, Reply). Subordinate to these motions are Defendants' unopposed Motions to Seal (Doc. 217) and for Leave to File Excess Pages for Statement of Facts (Doc. 234).

The Court finds this matter appropriate for resolution without oral argument. *See* LRCiv 7.2(f). After careful review of the briefing, the Court rules on the motions as follows:

1. Defendants' Notice of Noncompliance (Doc. 225), therein requesting terminating sanctions as to all counts – **GRANTED** in part, **DENIED** in part;
2. Defendants' Motion to Seal (Doc. 217) – **GRANTED**;
3. Defendants' Motion for Leave to File Excess Pages (Doc. 234) – **GRANTED**;
4. Defendants' Motion for Summary Judgment (Doc. 218) – **GRANTED**;
5. Plaintiff's Cross Motion for Partial Summary Judgment (Doc. 233) – **DENIED**;
6. Plaintiff's Motion for Protective Order (Doc. 229) – **DENIED**.

## I. BACKGROUND

### A. Procedural History

On February 24, 2025, Plaintiff Chidinma Grace Salako, proceeding *pro se*, filed her initial complaint in Pinal County Superior Court against Defendants Nationstar Mortgage LLC d/b/a Mr. Cooper and Rushmore Loan Management Services LLC. (Doc. 1.) The complaint alleged eleven counts of state law violations broadly stemming from residential home loan payments made to Defendants, but including other tangentially related claims of wrongdoing. (*See* Doc. 1-2, FAC.)[1] After service, Defendants timely removed on the basis of diversity jurisdiction (Doc. 1). On May 5, 2025, Defendants jointly moved to dismiss for failure to state a claim (Doc. 19), to which Plaintiff responded (Doc. 22), and Defendants replied (Doc. 28).

Before the Court could rule, it was flooded with filings. In just three weeks, Plaintiff filed a "Relation Back of Amendments Pursuant to Fed. R. Civ. P. 15(c)" (Doc. 18), a motion for sanctions (Doc. 23), a withdrawal of the motion for sanctions (Doc. 24), a motion to strike Defendants' declaration (Doc. 25), a second opposition to the motion to dismiss (Doc. 26), a notice of errata (Doc. 27), a motion for leave to supplement her second opposition (Doc. 32), a motion to stay proceedings for 30 days (Doc. 34), another motion

[1] The FAC remains the operative complaint.

to strike (Doc. 36), a motion for joinder of additional parties (Doc. 37), another notice of errata (Doc. 38), a withdrawal of the motion to stay (Doc. 39), a motion for enforcement of order granting electronic filing (Doc. 40), a notice of withdrawal of the motion for joinder (Doc. 41), and another motion for joinder (Doc. 42).

The Court reviewed the lot, and granted the motion to dismiss as to the claims in the FAC for an Accounting (Count VIII), Violation of Arizona Consumer Fraud Act (Count X), and Quiet Title (Count XI). (Doc. 43.) The remaining counts were preserved.[2] (Doc. 43.) The Court further ordered the denial of Plaintiff's Motions to Strike, Supplement, Join, Enforce, and (again) Join. (Doc. 43.)

Discovery proved no smoother than pleading. Littered across the docket were discovery disputes (Docs. 91, 93, 98, 109, 151, 155, 156, 191, 210) and motions to stay (Docs. 44, 145), amend (Docs. 48, 50, 179) compel (Docs. 68, 200), clarify (Doc. 54), strike or sanction (Docs. 99, 100, 112, 127, 128, 171), quash (Docs. 143, 179), protect (Docs. 138, 139, 145), and reconsider (Doc. 214), some of which were quickly withdrawn (Docs. 45, 49, 63), and others of which included declarations, oppositions, and replies.

The Court punctuated the changing of the seasons with its orders responding to these filings. (Docs. 43, 61, 129, 159, 182, 196, 213, 215, 243.) In them, the Court observed Plaintiff's increasingly troubling behavior. Notice the Court's neutral language in resolving the first discovery dispute:

> Finally, the parties' written communication demonstrates a good faith attempt on both sides to resolve the disclosure dispute. While Defendants disagree with Plaintiff's characterization of the document as disingenuous, they nonetheless attempted to resolve the issues raised by Plaintiff . . . . Nothing in the record suggests that Defendants are not "willing to work cooperatively with Plaintiff."

(Doc. 129.) But after learning more details underpinning some of the disputes, the Court's neutral language grew more pointed:

[2] Count I, Breach of Contract; Count II, Breach of Covenant of Good Faith and Fair Dealing; Count III, Negligence; Count IV, Fraudulent Misrepresentation; Count V, Negligent Misrepresentation; Count VI, Fraudulent Concealment; VII, Declaratory Relief; and Count IX, Intentional Infliction of Emotional Distress.

> After reviewing the discovery requests and responses, interparty communications, and the parties' joint statement, the Court finds that Plaintiff has acted unreasonably to obstruct Defendant's discovery efforts . . . . Plaintiff has misstated and defied the Court's orders, raised unfounded allegations of misconduct against opposing counsel and inundated this Court with frivolous filings . . . . Should she violate any court order or rule, continue to inundate the Court with frivolous filings, misrepresent law or authority in her briefing, or obstruct the discovery process further, the Court will order Plaintiff to show cause why the Court should not issue monetary sanctions, evidentiary sanctions, or both against her.

(Doc. 159 (citations omitted).) Plaintiff ignored the stern caution. Her behavior devolved further. Soon, she was caught altering Defendants' Requests for Admission (RFA). The Court wrote:

> Plaintiff's behavior is very troubling. She has altered Rushmore's RFAs[,] denied several of Nationstar's RFAs that are proven true in likely violation of her Rule 11 obligations[,] evaded requests for information that Defendants were entitled to access in order to support or test her $50 million damages claim[,] attempted to obstruct Defendants' discovery of her relevant complete health and credit score records[,] defied the Court's Scheduling Order[,] and unnecessarily multiplied litigation . . . . The Court strongly considered granting Defendants' multiple requests for terminating sanctions, as is evident in the closeness of the question in the Court's analysis of the *Dreith* factors[.]

(Doc. 213 (cleaned up).) Nonetheless, the Court limited its sanction to deeming admitted the several RFAs altered by Plaintiff. (Doc. 213.) The Court narrowly declined to issue terminating sanctions, instead "bending towards the exercise of restraint." (Doc. 213.) The Court expressly warned, however, that such sanctions remained on the table: "Plaintiff should realize that she now walks a fine line." (Doc. 213.)

This brings us to the present. Having now concluded discovery, Defendants submit yet another notice of noncompliance. (Doc. 225.) The parties also file dueling motions for summary judgment. (Docs. 218, 233.) The Court has carefully reviewed the arguments, the statement of facts, the evidence cited in the motions, and now proceeds to recite the relevant undisputed facts.

**B. Undisputed Facts**

On April 27, 2022, Plaintiff obtained a 30-year Federal Housing Administration (FHA) loan (the Note) of $420,563.00 from DHI Mortgage Company, Ltd. Limited Partnership (DHI). (Doc. 218-8, SOF ¶ 7, Ex. 1; Doc. 235, Pl. Ex., PX-1.)[3] The Note required Plaintiff to make payments on the first of the month beginning June 1, 2022 in the amount of $1,888.52. (SOF ¶ 8, Ex. 1; Pl. Ex., PX-1.) The initial monthly payment amount did not include property taxes or hazard insurance. (SOF ¶ 8, Ex. 1; Ex. B, N-RFA Nos. 4–5 (admitted)[4].) The Note's interest rate is 3.5% *per annum* and remains fixed for the life of the loan. (SOF ¶¶ 9–10, Ex. 1; Ex. B, N-RFA Nos. 4–5 (admitted).) Pursuant to the Note, payments made fifteen days late are subject to a late charge of 4.0% of any overdue principal and interest payments. (SOF ¶ 12, Ex. 1; Pl. Ex., PX-1.)

Also on April 27, 2022, Plaintiff electronically recorded the Deed of Trust in Pinal County. (SOF ¶ 13, Ex. 2; Pl. Ex., PX-2.) The Deed requires Borrower (Plaintiff) to make monthly escrow payments to cover property taxes, hazard insurance, and mortgage insurance premiums. (SOF ¶¶ 14, Ex. 2 § 3; Pl. Ex., PX-2 § 3.) That total changes over time, as taxes and insurance premiums change. (SOF ¶ 15, Ex. 2 § 3; Pl. Ex., PX-2 § 3.) The Deed establishes a payment application waterfall, so payments are applied in priority order: mortgage insurance premiums, taxes and assessments, interest, amortization of the principal, and then finally late charges. (SOF ¶ 17, Ex. 2 § 2; Pl. Ex., PX-2 § 2.) Partial payments may be held for a reasonable time until the Borrower (Plaintiff) "brings the Loan current" (*i.e.*, provides full payment for the month). (SOF ¶ 18, Ex. 2 § 1; Pl. Ex., PX-2 §

---

[3] Plaintiff does not submit a Controverting Statement of Facts as required by LRCiv. 56.1(b). Instead, she attaches to her Cross Motion for Summary Judgment (X-MSJ) four declarations in her name (X-MSJ-2, -3, -4, -6) and one in the name of Andrea Lue Sang-Cox (X-MSJ-5). Her exhibits, filed separately, are improperly joined, not Bates stamped, and contain argumentative titles. (*See* Doc. 235, Pl. Ex.) Because she does not submit a Controverting Statement of Facts and her Cross Motion for Summary Judgment is scattered and difficult to parse, the Court has attempted to construe and apply her arguments to the best of its abilities. However, "Judges are not like pigs, hunting for truffles buried in briefs," so the Court will only look so thoroughly. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[4] The Court deemed admitted Defendant Rushmore RFAs 1-15 (R-RFA) and Defendant Nationstar RFAs 2-5 and 7-10 (N-RFA). (Doc. 213 at 10.) Accordingly, the Court will cite those RFAs throughout with the notation '(admitted)'.

1.) If Plaintiff does not timely "pay the full amount," the Note declares she "will be in default." (Ex. 1 § 8; Pl. Ex., PX-1 § 8.) Defendant Rushmore and Defendant Nationstar are not named as parties to the Note nor to the Deed. (SOF ¶¶ 19–20, Ex. 1–2; Pl. Ex., PX-1–2.) Neither Plaintiff nor Defendants state that they signed a written contract with the other. (SOF ¶¶ 20–21, Ex. E, Rog. No. 2.)

At or around the time the Deed was recorded, an amortization schedule, "PROVIDED AS AN EXAMPLE ONLY," showed payment amount changes over time, with an initial payment listed at $2,161.67, and due June 1, 2022. (Pl. Ex., PX-5.) But this was just the estimate. The first payment—after including principal, interest, and escrow—was set at $2,217.48. (SOF ¶ 15, Ex. D; Pl. Ex., PX-3.) Plaintiff made the first payment of $2,217.48, and Defendant Rushmore received the payment. (SOF ¶¶ 25–26, Ex. 4; Pl. Ex., PX-6.)

The evidence shows Defendant Rushmore serviced the Note from June 1, 2022 through December 1, 2022, and Plaintiff made timely payments of $2,217.48 through and including October 2022. (SOF ¶¶ 22–23, 25, Ex. 3; Pl. Ex., PX-17.) In November 2022, however, Plaintiff paid $1,888.52 to Defendant Rushmore, $328.96 less than the monthly payment due. (SOF ¶¶ 27–28, R-RFA 10–11 (admitted).) Defendant Rushmore placed the partial payment in suspense, as permitted by the Deed. (SOF ¶ 30, Ex. 2 § 1; Ex. G, Salako Depo. at 87:14–88:3.) Defendant Rushmore then applied the partial payment to the principal on November 30, also as permitted by the Deed. (SOF ¶¶ 17, 30, Ex. 2 § 2, Ex. 4.)

On December 2, 2022, Defendant Rushmore transferred loan servicing obligations to Defendant Nationstar, though Plaintiff became aware of the pending service transfer sometime before that date. (SOF ¶ 31, Ex. 5; Pl. Ex., PX-7, 8.) On December 19, Plaintiff paid Defendant Nationstar $328.96 for December's payment, then another $1,888.52 to Defendant Nationstar on December 22. (SOF ¶ 32, Ex. 6.) Nationstar assessed Plaintiff a late fee of $75.54 for the late repayment. (SOF ¶ 33, Ex. 6.) Plaintiff then complained to Defendant Nationstar about duplicate December repayments, stemming from her

November 30 payment to Defendant Rushmore ($1,888.52) and her December 22 payments to Defendant Nationstar ($2,217.48). (SOF ¶ 36, Ex. 13 at NSM_Salako 002695; Pl. Ex., PX-25.)[5] In response, in January 2023, Defendant Nationstar reversed Defendant Rushmore's previous application of the November 30 payment ($1,888.52) to the principal and instead applied it forward, to Plaintiff's pending February repayment; Defendant Nationstar also reversed the December $75.54 late charge. (SOF ¶¶ 34, 36, Ex. 13 at NSM_Salako 002695.) Plaintiff then timely completed her January 2023 repayment ($2,217.48) and her remaining February 2023 repayment ($328.96). (SOF ¶¶ 35–37, Ex. 6.) Plaintiff continued making timely repayments through December 2023. (SOF ¶ 38–39, Ex. 6.)

During that calendar year, however, Pinal County property taxes increased on the property. (SOF ¶ 40, Exs. I, J.) In December 2023, Defendant Nationstar alerted Plaintiff to the change in property taxes, which resulted in Plaintiff's monthly repayments increasing from $2,217.48 to $2,491.93 starting February 2024. (SOF ¶¶ 41–44, Ex. 8.) Yet, come February, Plaintiff continued furnishing the earlier, reduced repayment obligation ($2,217.48), rather than the new, increased repayment obligation ($2,491.93). (SOF ¶¶ 47–49, Ex. 6.) In so doing, Plaintiff accumulated late charges and Defendant Nationstar held the partial payments in suspense—just as Defendant Rushmore had done nearly a year earlier—then applied the suspended payments per the waterfall provision of the Deed. (SOF ¶¶ 49–50, Exs. 2, 6.)

As part of Defendant Nationstar's normal business practice, the company sent Plaintiff monthly statements reflecting upcoming payments due. (SOF ¶ 51, Brown Decl. ¶¶ 54–58, Exs. 7–12; Pl. Ex., PX-31.) Each statement is generated on or around the 19th day of the month, with automatic emails delivering the statements shortly thereafter. (SOF ¶¶ 51–52, Brown Decl. ¶¶ 54–58, Exs. 7–12; Pl. Ex., PX-31.) Payments made after a

[5] Plaintiff argues in her Cross Motion for Summary Judgment that on December 15, 2022 Defendant Nationstar sent an email indicating "approximately $4,090.80" was "33+ days past due." (X-SMJ at 4 (citing Pl. Ex., PX-9).) But, as discussed *infra*, Plaintiff appears to have stitched together two different emails to manufacture her desired evidence. The Court will not consider the fraudulent exhibit as evidence.

statement is generated are reflected on the following month's statement. (SOF ¶¶ 51–52, Brown Decl. ¶¶ 54–58, Exs. 7–12; Pl. Ex., PX-31.) Plaintiff often paid after the monthly statement issued. (SOF ¶ 52, Brown Decl. ¶¶ 60, 62, Ex. 6.) Her monthly statements therefore frequently showed that she owed her regular upcoming monthly plus late charges and overdue payments, less any earlier partial payments. (SOF ¶¶ 52–56, Brown Decl. ¶¶ 60, 62, Ex. 6.)

During this period, Defendant Nationstar also sent at least one inspector to the property per the Deed's inspection provision. (SOF ¶ 57, Brown Decl. ¶ 70, Ex. 2 § 7 ("Lender or its agent may make reasonable entries upon and inspections of the Property."); Hunt Decl. ¶¶ 5–6, Ex. A.) On one occasion, the inspector (or inspectors) knocked on the door but could not reach Plaintiff, and so left a sealed envelope at the door requesting Plaintiff contact Defendant Nationstar. (SOF ¶ 59, Hunt Decl. 5–6, Exs. A, B; Ex. G, Salako Depo. at 154:9–17.) Plaintiff also once paid the hazard insurance premium directly (PX-21), rather than through Defendant Nationstar, but was later refunded by the insurer because Defendant Nationstar had already paid it (FAC ¶ 11(e).) Finally, Defendant Nationstar has not placed the home into foreclosure as of the date of their Motion for Summary Judgment. (SOF ¶ 55, Brown Decl. ¶ 64.)

## II. LEGAL STANDARD

### A. Rule 37 Discovery Sanctions

Under the Federal Rules of Civil Procedure, if a party fails to obey a discovery order, including an order issued under Rule 26(f), the court may order sanctions. Fed. R. Civ. P. 37(b)(2)(A). Options available to the court include: (i) directing that designated facts be taken as established for purposes of the action; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination. *Id.* The Court is not limited to these options.

*See id.* ("[T]he court where the action is pending may issue further just orders."); 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 37:22 (June 2026 update) ("The list of merits sanctions . . . is not exhaustive; the court may impose any other sanctions as are just under the circumstances."). In other words, district courts retain considerable discretion to impose a "wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (citations omitted).

Terminating sanctions are the harshest, and "should only be imposed in extreme circumstances." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992), as amended (May 22, 1992). The party subject to the sanction must have acted with "willfulness, fault or bad faith." *Sigliano v. Mendoza*, 642 F.2d 309, 310 (9th Cir. 1981) (citing *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 212 (1958)). Before issuing terminating sanctions, a district court is required to weigh: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions. *Thompson v. Hous. Auth. of City of Los Angeles*, 782 F.2d 829, 831 (9th Cir. 1986) (citation omitted). Nested within these factors are "general due process concerns" that require matching the misconduct to the sanction. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 381 (9th Cir. 1988) (citation omitted). In other words, there must be a "nexus between the party's actionable conduct and the merits of the case." *Id.*

The court can also "order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure . . . ." Fed. R. Civ. P. 37(b)(2)(C). Before awarding such sanctions, "the court must make an express finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (citing *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir.1997)). A party "demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* (quotation omitted). The bad

faith requirement ensures that the district court's exercise of its broad power is properly restrained, and "preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Id.* Additionally, the amount of monetary sanctions must be "reasonable." *Id.*

**B. Sealed Filings**

Documents may be sealed or redacted to protect privacy interests. *See* Fed. R. Civ. P. 5.2(a)–(e). In the Ninth Circuit, courts "start with a strong presumption in favor of access to court records." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). "In order to overcome this strong presumption, a party seeking to seal a judicial record must articulate justifications for sealing that outweigh the historical right of access and the public policies favoring disclosure." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006). Where a document is "more than tangentially related to the merits" of a case, the party seeking to seal the document must demonstrate "compelling reasons to keep the documents under seal." *Ctr. for Auto Safety*, 809 F.3d at 1103.

**C. Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). "The Court need not 'comb the record' looking for other evidence; it is only required to consider evidence set forth in

the moving and opposing papers and the portions of the record cited therein." *New Leaf Publ'g, Inc. v. Top Innovations LLC*, 2025 WL 3211442, at *2 (C.D. Cal. Oct. 21, 2025) (citing Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

As the moving party, Defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When, as here, the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party does so, the nonmoving party must produce evidence to support its claim or defense. Id. at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the nonmoving party's evidence if it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. The nonmoving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.") (citation omitted).

. . .

. . .

. . .

## III. ANALYSIS

### A. Plaintiff's failure to follow the Court's discovery orders warrant terminating sanctions as to her Intentional Infliction of Emotional Distress claim (Count VIII).

In April 2026, the Court ordered Plaintiff to produce "all documents responsive to Nationstar's second set of RFP's 26 through 30 and 66 through 73" as relevant to Plaintiff's alleged emotional distress. (Doc. 213.) Defendants now notify the Court of Plaintiff's noncompliance, arguing: (i) she failed to produce the required documents, (ii) her pretrial exhibits contain improper cover pages and arguments in the titles, (iii) the exhibits are not Bates stamped, and (iv) she improperly combined exhibits from multiple sources. (Doc. 225.) As relief, Defendants renew their request for terminating sanctions. (Doc. 225.) Plaintiff, for her part, untimely responds, denying the allegations and characterizing her actions as being made in "good faith," and asserting any deficiencies are curable. (Doc. 244.) Defendants reply. (Doc. 245.)

Before issuing terminating sanctions, a district court is required to weigh: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions. *Thompson*, 782 F.2d at 831. Nested within these factors are "general due process concerns" that require matching the misconduct to the sanction. *Halaco Eng'g Co.*, 843 F.2d at 381. In other words, there must be a "nexus between the party's actionable conduct and the merits of the case." *Id.*

As noted *supra*, the Court previously bent "towards the exercise of restraint," refraining from issuing terminating sanctions, in part because the fifth factor, the availability of "less drastic sanctions," militated against termination. (Doc. 213.) The Court instead opted to deem admitted the altered RFAs. (Doc. 213.) But the Court warned Plaintiff therein: "Plaintiff should realize that she now walks a fine line," "[s]hould she fail to comply with the production of documents outlined herein, the Court will revisit the remedy of terminating sanctions . . . ." (Doc. 213.) The Court, now having revisited the

matter, has decided to issue the terminating sanctions as to Plaintiff's Intentional Infliction of Emotional Distress (IIED) claim.

As Defendant contends, Plaintiff has wholly failed, once again, to comply with this Court's order. She ignored the direction to Bates stamp her documents, refrain from arguing in titles (*e.g.*, PX-11, "2. Economic Bully"), and to separate documents from different sources (*e.g.*, PX-20 (including Pinal County Treasurer Payment Receipt *and* email from Wells Fargo)). These errors alone, however, do not warrant terminating sanctions. Although they cause headache for Defendants, they are better remedied by monetary sanctions (*i.e.*, a compensation scheme for wasted time). But these errors are not alone. Plaintiff's more grievous commission was to, yet again, ignore the Court's order directing her to produce documents relating to her alleged emotional distress.

In the prior order, the Court specifically noted that Defendant Nationstar's RFPs 26 through 30 and 66 through 73 requested documents were necessary for Defendants to defend against Plaintiff's IIED claim, in that the requested documents sought to explore the *cause* and *severity* of her alleged emotional distress. Despite the order, however, Defendants contend she did not produce any new documents. Plaintiff disputes the contention. The Court agrees with Defendants.

First, to the extent Plaintiff merely promises she fulfilled her obligations, her credibility with this Court is exhausted. In this latest discovery dispute redux, she initially filed a notice of compliance, stating that her recent discovery productions were "responsive to the discovery items identified in the Court's Orders." (Doc. 220 at 2.) Then, after Defendants filed a notice of noncompliance, she changed her position, saying she "cannot produce documents that do not exist." (Doc. 244 at 3.) In addition to the latent skepticism induced by her changing positions, the latter position itself is incredible. Some of the documents sought by Defendants (RFPs 66–73) relate to another federal lawsuit, in which Plaintiff made *public filings*. Though Defendants may obviously pull those documents themselves, it is the documents *underlying* the public ones to which Defendants are entitled. Plaintiff's response that underlying documents simply "do not exist" is

implausible, and more importantly she provides no legitimate reason for *how* or *why* the Court should accept her bold assertion of their nonexistence.

Second, even if those documents truly did not exist or could not be accessed by Plaintiff, the other documents sought (RFPs 26–30) regard her own personal communications with individuals she previously alleged could support her IIED claims. These are documents squarely in her control, but to which she nonetheless also claims "do not exist" or "are outside her control." (Doc. 244 at 3.) Doubtful, and in any event she offers no explanation for why she does not have them.

Terminating sanctions are warranted now, unlike before, because the parties have concluded fact discovery, and the prejudice to Defendants is now insurmountable and lacks an alternative cure. Plaintiff alleges "significant anxiety and fear," "severe emotional and physical distress," "sleepless nights," "a marked deterioration in her physical and emotional well-being," and more. (FAC ¶ 72.) But she also stated in her prior lawsuit that she was "emotionally and mentally traumatized" and "unable to afford [her] mortgage" due to the events of *that* lawsuit (entirely unrelated to the Defendants here). (Doc. 191 at 2–3.) She also previously indicated that her friends and family would be able to testify to her emotional state over time, then withdrew those individuals as witnesses, and now claims no communications exist between her and those individuals.

Plaintiff cannot eschew summary judgment while withholding evidence from Defendants and ignoring Court orders. The Court thus incorporates its previous discussion of the five *Thompson*/*Dreith* factors, and now finds that the third factor, the risk of prejudice to Defendants, and the fifth factor, the availability of less drastic sanctions, both weigh strongly in favor of terminating sanctions. (Doc. 213 (citing *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011)).) The Court also finds the act was committed with "willfulness, fault or bad faith," given that she has repeatedly committed such infractions and, as discussed *infra*, even attempts to now perpetrate fraud on this Court through the manipulation of submitted evidence. *See Sigliano*, 642 F.2d at 310.

. . .

The Court will not terminate all of her claims. Her IIED claim and the withheld evidence contain a tight nexus warranting termination, but the nexus weakens for the remaining claims. *See Halaco Eng'g Co.*, 843 F.2d at 381. On the remaining claims, though her alleged emotional distress ultimately informs the harm analyses (and damages calculations), she also can nonetheless prevail on other grounds. This is not true for the IIED claim, where the withheld evidence is necessary to the survival of the claim. Therefore, the Court will terminate the IIED claim.[6] As discussed *infra*, the Court will also levy monetary sanctions on Plaintiff.

**B. The Court finds compelling reasons to grant Defendants' Motion to Seal and good cause to grant Defendants' Motion for Leave to File Excess Pages.**

The Court finds compelling reasons to grant Defendants' Motion to Seal. (Doc. 217.) The documents are sealed to protect Plaintiff's privacy interest. *See* Fed. R. Civ. P. 5.2(a)–(e). Although there is a "strong presumption in favor of access to court records," here Defendants overcome the presumption by showing the documents to be sealed are Plaintiff's private health records, including testimony from her primary care physician. *See Abbey v. Hawaii Emps. Mut. Ins. Co. (HEMIC)*, 760 F. Supp. 2d 1005, 1013 (D. Haw. 2010), on reconsideration in part (Feb. 7, 2011) ("The need to protect medical privacy qualifies as a 'compelling reason' that overcomes the presumption of public access to judicial records."). Plaintiff does not oppose the motion.

The Court also finds good cause to file an overlength statement of facts in support of Defendants' motion for summary judgment. (Doc. 234.) The additional length is warranted by the fact that Defendants filed the statement of facts jointly and that the allegations require Defendants to provide a technical explication of accounting records. Plaintiff does not oppose the motion.

. . .

---

[6] Because the Court now terminates Plaintiff's IIED claim and the remaining claims will be dismissed before the harm stage of analysis, the Court need not consider Plaintiff's medical records. The Court therefore denies Plaintiff's Motion for Protective Order as moot. (Doc. 229.)

**C. Defendants' Motion for Summary Judgment is granted as to Counts I–VII.**

*1. Breach of Contract (Count I) and Breach of Covenant of Good Faith and Fair Dealing (Count II)*

Defendants argue the evidence shows no contract existed between Plaintiff and the Defendants by which Plaintiff can establish, at the threshold, the privity required for breach of contract claims. (MSJ at 5–6.) Plaintiff does not rebut the argument in response, though her initial allegations assert that Defendants were assigned the contract. (FAC ¶ 17.)

It is canonical contract law that to establish a breach of contract claim, one must first "prove the existence of the contract" between the parties. *Clark v. Compania Ganadera de Cananea, S.A.*, 95 Ariz. 90, 94 (1963) (citation omitted). Without such a contract, no express or implied obligations can arise under it. *See Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466, 474 (Ct. App. 1998). Exceptions to this general rule exist. *See, e.g.*, *Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242, 245 (1984) (holding "that privity is not required to maintain an action for breach of the implied warranty of workmanship and habitability" where the homeowner was a subsequent purchaser of the home); *Lofts at Fillmore Condo. Ass'n v. Reliance Com. Constr., Inc.*, 218 Ariz. 574, 577 (2008) (holding that the implied warranty is enforceable by a homebuyer against the builder even in the absence of a direct contractual relationship).

Here, the evidence shows no contractual privity exists between Plaintiff and Defendants. The parties never entered into any contract, nor did Defendants become a party to the Note or Deed. (SOF ¶¶ 19–21, Ex. 1–2, Ex. E, Rog. No. 2; Pl. Ex., PX-2.) Plaintiff provides no contrary evidence. Instead, Plaintiff contends Defendants were assigned a "beneficial interest" in the contract, therefore giving rise to the breach. (FAC ¶ 17.) But "beneficiaries must be explicitly named in the contract to enforce the contract's provisions" against them. *Henderson v. Moskowitz*, 261 Ariz. 8 ¶ 14 (2025) (citation omitted). Defendants were not so named. And, in general, ample caselaw supports the notion that the existence of a loan servicer does not, "without more, give rise to a contractual relationship . . . ." *Chopko v. Newrez LLC*, 2026 WL 1894785, at *2 (Ariz. Ct. App. June

15, 2026). Therefore, the Court enters judgment at the threshold on behalf of Defendants on Counts I and II: the parties were not in privity.

*2. Negligence (Count III)*

Next, Defendants argue Plaintiff fails to establish the *prima facie* elements of negligence, primarily because they did not breach their narrow duty of care to Plaintiff. (MSJ at 6–10.) Plaintiff does not intelligibly rebut the argument in response.

To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 143 (2007). The first element, whether a duty exists, is a matter of law; the remaining elements are factual issues. *Id.*

Defendants contend their non-contractual duty is "narrow," citing cases for the proposition that the duty is limited only to "disclosing the correct amount of monthly payments due under the loan agreement." (MSJ at 7.) Plaintiff provides no contrary caselaw, nor does she attempt to expand on the proposed duty owed by Defendants. Having reviewed Defendants' arguments, the Court concludes Defendants owed Plaintiff a duty of care but that, indeed, the duty was limited to an obligation to "disclose the correct amount of monthly payments due under [the] loan agreement." *McMillan v. Wells Fargo Bank*, 2013 WL 11522057, at *6 (D. Ariz. Apr. 11, 2013); *see also McIntosh v. IndyMac Bank, FSB*, 2012 WL 176316, at *3 (D. Ariz. Jan. 23, 2012) (noting some courts have found the duty "is very narrow," "limited only to the duty to disclose") (citation omitted).

Here, Defendants provide evidence that they fulfilled the duty to disclose correct information because the statements sent to Plaintiff were accurate. The company sent Plaintiff monthly statements reflecting outstanding payments due. (SOF ¶ 51, Brown Decl. ¶¶ 54–58, Exs. 7–12; Pl. Ex., PX-44A.) The statements were generated on or about the 19th day of the month, with automatic emails delivering the statements shortly thereafter. (SOF ¶¶ 51–52, Brown Decl. ¶¶ 54–58, Exs. 7–12.) Payments made after a statement was

generated were reflected on the following month's statement. (SOF ¶¶ 51–52, Brown Decl. ¶¶ 54–58, Exs. 7–12.) Plaintiff often paid after the monthly statement issued. (SOF ¶ 52, Brown Decl. ¶¶ 60, 62, Ex. 6.) As such, her monthly statements often reflected her upcoming regular monthly payment together with her late charges and overdue payments, less the partial payments made earlier. (SOF ¶¶ 52–56, Brown Decl. ¶¶ 60, 62, Ex. 6.) In short, Defendants provide a clear accounting of *why* a precise amount was owed, and *when* and *how much* Plaintiff actually paid. This information was then communicated to Plaintiff accurately. (Pl. Ex., PX-44A.)

Plaintiff does not provide contravening evidence. Her first attempt at doing so is to reference the allegedly inaccurate delinquency notice issued in December of 2022 stating that she "owed approximately $4,090.80." (X-MSJ at 4–5.) But that claim is supported only by exhibit PX-9, an exhibit the Court has determined, *infra*, was fabricated. The Court will not consider it. Her second argument is that, generally, Defendants "repeatedly portray" her as someone failing to make her mortgage payments, despite her paying "approximately $2,217.48 between December 2022 and late 2025." (X-MSJ at 5.) The fact and amount of her payments is undisputed, however, as Plaintiff and Defendants agree that she paid $2,217.48 most months. (SOF ¶¶ 47–49, Ex. 6; Pl. Ex., PX-44A.) The problem is that she owed more than that. As Defendant's have shown, Plaintiff owed $2,217.48 in the years 2022 and 2023. However, her required repayment increased in February 2024, as permitted by the Deed, to $2,491.93, because the Pinal County property taxes increased on Plaintiff's property. (SOF ¶¶ 40–44, Ex. I, J, 8; Pl. Ex., PX-2.) Plaintiff's repayments were short, providing only partial payment. Defendants were therefore permitted to place the payments in suspense, before applying them to the waterfall schedule. (SOF ¶ 17, Ex. 2 § 2; Pl. Ex., PX-2 § 2.) Plaintiff provides no evidence to contest this fact.

Plaintiff's remaining miscellaneous allegations from the First Amended Complaint do not give rise to a duty to disclose the correct amount of money owed. *McIntosh*, 2012 WL 176316, at *3. Her allegations—that Defendants harassed her or failed to communicate, respond to calls, provide an email address, and manage escrow properly—

do not, as a matter of law, identify a duty owed to Plaintiff by Defendants, and otherwise are unsupported by the evidence. FAC ¶ 29. Therefore, the Court agrees with Defendant that the evidence shows no dispute as to the fact that Defendants fulfilled their duty to Plaintiff to disclose correct information. The Court enters judgment in favor of Defendants on Plaintiff's negligence claim (Count III).

*3. Fraudulent Misrepresentation (Count IV), Negligent Misrepresentation (Count V), and Fraudulent Concealment (Count VI)*

Defendant next contends that Plaintiff fails to establish the *prima facie* elements of fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment. (MSJ at 14–18.) Again, Plaintiff does not intelligibly rebut the argument.

To establish fraudulent misrepresentation, a Plaintiff must prove: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury. *Carrel v. Lux*, 101 Ariz. 430, 434 (1966)

Negligent misrepresentation requires showing: (1) Defendants gave incorrect information for the guidance of others in their business transactions; (2) Defendants intended or could reasonably foresee that Plaintiff would rely on that information; (3) Defendant failed to exercise reasonable care in obtaining or communicating that information; (4) Plaintiff did rely on that incorrect information; (5) the reliance was justified; and (6) the reliance caused damages. *Taeger v. Cath. Fam. & Cmty. Servs.*, 196 Ariz. 285, 294 (Ct. App. 1999).

Finally, fraudulent concealment is when "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension*

*Tr. Fund*, 201 Ariz. 474, 496 (2002), as corrected (Apr. 9, 2002) (citation omitted). In other words, the evidence must show "knowledge of the false information and action by the defendant that intentionally prevented the plaintiff from finding the truth." *Id.* (citation omitted).

Each of the three claims fail because the evidence shows no operative falsity. Falsity is a required element of the *prima facie* case claims of fraudulent misrepresentation (element two, falsity) and negligent misrepresentation (element one, incorrect information), and an embedded element in the knowledge requirement of fraudulent concealment (the Defendant had "knowledge of the false information"). *Wells Fargo Bank*, 201 Ariz. at 496.

Here, Plaintiff's falsity allegations lack bite, fitting her "pattern of making grand but ambiguous statements . . . ." (Doc. 213.) She alleges Defendants made a range of false statements, including that Defendants notified her that in December 2022 she was late to pay $4,090.80 due November 2024 (FAC ¶ 37(a)), that they had no record of insurance coverage for the property (FAC ¶ 37(b)), that she had missed payments (FAC ¶ 37(c)–(g)), that they maintained a physical office in Chandler, AZ (FAC ¶ 37(j)), that her account was in default (FAC ¶ 38), and that her interest rate was fixed at 3.5% (X-MSJ at 7.)

Reviewing them in order, the Court sees no evidence to support the conclusion that any of the alleged false statements were false. First, the Court finds no evidence that Defendants notified her in December 2022 that she was tardy (in the future) to pay her bills. As discussed *infra*, the sole supporting exhibit is fabricated. (Pl. Ex., PX-9.) Second, Plaintiff provides no evidence of Defendants' statement regarding the lack of insurance coverage; Defendants, meanwhile, provide evidence that the subject property always maintained hazard insurance and that they never told her otherwise. (SOF ¶¶ 86–89, Brown Decl. ¶¶ 66, 68–69.) Third, Plaintiff claims that Defendants' statements about missed and partial payments were false. In support, Plaintiff shows that she paid $2,217 consistently and cites to an amortization table, "PROVIDED AS AN EXAMPLE ONLY," for the fact that she paid the correct amount over time. (Pl. Ex., PX-5, 14–16.) The amortization table,

of course, does not announce her actual obligation, hence it is an “ EXAMPLE ONLY.” (Pl. Ex., PX-5.) Plaintiff provides no other evidence to show Defendants listed the wrong repayment amounts. Defendants, on the other hand, point to the Deed, the property tax calculation, and their internal records to show that her payments were partial and therefore missed. Fourth, Plaintiff claims Defendant Nationstar misrepresents that they have a physical office in Chandler, AZ. But Defendant Nationstar does have a physical office in Chandler, AZ. (SOF ¶ 99, Brown Decl. ¶ 81.) Plaintiff does not allege (nor does she provide any evidence) that Defendant Nationstar represented that she could visit that office for assistance. She instead drove their on her own in order to “sort out the situation.” (FAC ¶ 37(j).) Therefore, the Court sees no evidence of falsity. Fifth, Plaintiff alleges Defendants falsely stated her account was in default. But, as discussed, she was by definition. (Ex. 1 § 8; Pl. Ex., PX-1 § 8.) And sixth, Plaintiff argues Defendants misrepresented that her interest rate would remain fixed at 3.5%. As evidence, she cites to a third-party company’s credit report showing her “Estimated Interest Rate” at “5.66%*.” (Pl. Ex., PX-42.) This evidence does not support Plaintiff’s argument. First, the rate is “estimated,” not actual. And second, the asterisk indicates the company “do[es] not guarantee the accuracy of this estimate because it does not factor in any additional monthly payments you make . . . such as insurance and property taxes that may be incorporated into your monthly payment.” (Pl. Ex., PX-42.) The 5.66% estimation appears to have done just that: factored in the property taxes and insurance premiums. This does not mean Defendants misrepresented her fixed rate. It means Plaintiff again miscomprehends the mechanics of the Deed. Plaintiff provides no other evidence that the interest rate deviated from 3.5%.

In sum then, Plaintiff provides no evidence of falsity, whereas Defendants provide ample evidence of truth. Therefore, the Court finds Defendants are entitled to summary judgment on the claims of fraudulent misrepresentation (Count IV), negligent misrepresentation (Count V), and fraudulent concealment (Count VI).

. . .

. . .

*4. Declaratory Relief (Count VII)*

Defendants argue that Declaratory Relief is not a separate cause of action, but rather a remedy for an underlying cause of action. (MSJ at 18.) Plaintiff does not contend otherwise. The Court agrees with Defendants. *See Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 770 (D. Ariz. 2012) ("A declaratory judgment action is a remedy for an underlying cause of action; it is not a separate cause of action . . . ."). Because the Court now enters judgment in favor of Defendants on all counts, so goes this count with the others. Judgment will be for Defendants.

**D. The Court grants Defendants' Motion for Attorneys' Fees due to Plaintiff's bad faith failure to comply with the Court's discovery orders.**

The Court previously deferred its ruling on Defendants' motion for attorneys' fees "until resolution of the entire matter." (Doc. 213.) Having now resolved the matter on all counts in Defendants' favor, the Court now grants Defendants' request for attorneys' fees.

As previewed *supra*, Plaintiff has acted with bad faith throughout this litigation. *See Leon*, 464 F.3d at 961. The Court previously concluded *inter alia* that Plaintiff had evaded Defendant Nationstar's RFAs, filed excessive and frivolous filings (*e.g.*, thrice moving to quash third-party subpoenas despite twice being told she lacked standing), obstructed Defendants' attempts to obtain more complete discovery, offered contradictory reasons as to why she could not accept hard versus digital copies of Defendants' discovery, and was even caught altering Defendant Rushmore's RFAs. (Doc. 213.) This alone is sufficient to show she "disrupt[s] the litigation" and "hamper[s] enforcement of a court order." *Leon*, 464 F.3d at 961.

Were it insufficient, however, Plaintiff's instant cross motion for summary judgment finishes the job, as she now attempts to commit fraud on the Court by doctoring (at least one) exhibit to support her argument about false delinquency. Repeating her argument in full:

> On November 21, 2022, [Defendant Nationstar] sent Plaintiff a "Welcome to the [Nationstar] Family" communication before servicing transfer operations

> had stabilized (PX-9). Shortly thereafter, on December 15, 2022, [Defendant Nationstar] issued another "Welcome" communication asserting that Plaintiff was "33+ days past due" and allegedly owed approximately $4,090.80 (PX-9). That delinquency assertion materially conflicts with . . . [Plaintiff's evidence].

(X-MSJ at 4.)

The exhibit is fabricated. To summarize its contents, PX-9 is three pages long, and consists of what appears to be an email sent by Defendant Nationstar to Plaintiff. On page one, the subject line reads "We're so glad you're here Chidinma," sent by Defendant Nationstar's 'DoNotReply' email address on December 15, 2022. (Pl. Ex., PX-9.) On page two, the body of the email reads, "Amount Due, $4,090.8, Payment Due 11/01/2024, includes fees, payment is 30+ days past due." (Pl. Ex., PX-9.) Putting these two pages together then, it reads as if Defendant Nationstar sent an email on December 15, 2022, announcing she was 30+ days past due on payments due in November 2024. Defendant Nationstar politely remarks they have "no records of the alleged December 2022 email, where Plaintiff claims the email stated a payment of $4,090.80 due in 2024." (Brown Decl. ¶ 66.)

The Court does not need a forensic expert to conclude the exhibit is fabricated. First, the email makes no sense. How could Plaintiff be 30+ days late on *future* payments? Second, in the upper left hand corner of the first two pages, a timestamp (presumably a remnant from the print-to-PDF function) reveals two different dates. On page one, the timestamp is "4/2/26," whereas the second page is "3/16/26." (Pl. Ex., PX-9.) In other words, Plaintiff converted two different documents to a PDF nearly three weeks apart, then stuck them together. Third, the context changes across the two pages. On page one, Defendant Nationstar is welcoming Plaintiff "home," with the final words on the bottom of the page reading "Here are just a few things we're particularly proud of[.]" (Pl. Ex., PX-9.) On the second page, the email then reads, "Hi Chidinma, We want to remind you that a recent payment was missed." (Pl. Ex., PX-9.) That contrast is improbable. Why would Defendant Nationstar address Plaintiff twice in one email: "Chidinma," followed by "Hi

Chidinma,"? (Pl. Ex., PX-9 (verbatim).) And why would they send introductory remarks, only to issue repayment reminders in the same breath? Fourth, the text announcing her late payment is compressed, rendering it visibly warped as compared to the rest of the email. And fifth, for good measure, the warped text is also in a different font color.

Plaintiff's bad faith abounds. The Court therefore awards attorneys' fees to Defendants. Given the fees must be reasonable, however, the Court elects for a modest award of $3,000, to be split and distributed evenly to the Defendants ($1,500/each). This is intended to be severe enough to deter Plaintiff from future bad faith conduct, yet not so grave as to mire Plaintiff in financial straits, given she is delinquent on mortgage payments and cares for her aging, ailing father.

The Court also acknowledges defense counsel. The Court has reviewed the myriad emails, phone call transcripts, and depositions throughout this litigation, and has only witnessed proper, ethical conduct. (*See, e.g.*, Doc. 213 at 16, n. 4 (commending Mr. Balser and Ms. Geyer for attempting to resolve discovery issues).) Any fault for unnecessary conflict lies with Plaintiff, and Plaintiff alone.

## IV. CONCLUSION

In sum, Plaintiff fails to provide sufficient evidence to create a genuine issue of material fact as to the elements of her claims. Accordingly, summary judgment in Defendants' favor is appropriate as to Counts I through VII. Plaintiff's final claim, Count VIII, is terminated by sanction due to Plaintiff's repeated and flagrant disregard for the Court's discovery orders. The Court also grants Defendants' request for monetary sanctions.

**IT IS THEREFORE ORDERED** granting Defendants' Motions to Seal (Doc. 217) and for Leave to File Excess Pages (Doc. 234).

**IT IS FURTHER ORDERED** granting and denying in part Defendant's Notice of Noncompliance. (Doc. 225.) The Court terminates Plaintiff's IIED claim (Count VIII) and awards Defendants attorneys' fees in the sum of $1,500 each (for a total of $3,000).

. . .

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment as to Counts I–VII (Doc. 218) and denying Plaintiff's Cross Motion for Partial Summary Judgment (Doc. 233).

**IT IS FURTHER ORDERED** denying Plaintiff's Motion for Protective Order as moot (Doc. 229) and directing the Clerk to close this matter.

Dated this 6th day of November, 2026.

Honorable John J. Tuchi
United States District Judge